You may proceed, Mr. Pollack. May it please the Court, Mr. Pollack. And I would like to – my name is Stephen Toronto, and I represent the appellant, Defendant Charles Jackson, in this matter, and I would like to reserve three minutes for rebuttal. I would like to go over some of the more salient facts in this case, because I do believe that this case is a – is a factually intensive case. Very briefly, in February 2003, an individual was apprehended after a high-speed chase around the Federal building over in Golden Gate. The officers involved were Federal Protective Service officers who have limited jurisdiction to crimes occurring either on Federal property or in areas adjacent to the Federal property, which was somewhat expanded by Region 9, the San Francisco division. The jurisdiction was expanded through a memorandum of understanding with San Francisco Police Department, which is important later on as I get through the facts. In particular, Mr. Jackson is a criminal or was a criminal investigator for the Federal Protective Service, and he was assigned to investigate the Petrie prosecution, and that is the individual who was apprehended. He was not assigned to investigate the actual officers and to determine the propriety of their actions. During the course of Mr. Jackson's investigation, he and others uncovered discrepancies between what the officers said about jurisdiction and what – and what they believed, in fact, occurred, and that is video surveillance camera indicated that the chase and the reason for the stop really took place further up the road by divesting Federal Protective Service of any jurisdiction. He promptly brought this discrepancy, and essentially the lies that the officers made in connection to their initial investigation or statements, he brought this to the attention of the superiors. He also brought this to the attention of the U.S. Attorney's Office. Within several days, in fact, the same day upon – the same day the U.S. Attorney received the information regarding the discrepancy and the video surveillance in particular, the U.S. Attorney's Office dismissed the charges against the individual, the assailant, and released him from custody based on Mr. Jackson's investigation. That day, his report was concluded. His report of investigation was concluded and signed off by his supervisor. During the course of the investigation on the last day, the 20th, one of the officers, Officer Hare, approached Mr. Jackson and said that it didn't occur – it didn't occur in the way that they originally stated. He essentially agreed with the – what was depicted on the video surveillance. At the same time, he also attempted to recant to Michael Conrad, who is also a criminal investigator, and Mr. Jackson's superior. And Mr. Conrad said, you can't recant to me because there are certain rules in effect. And this was testified to through a report through the government's own witnesses, the FBI agent and the OIG case agent, who said that when they took the statement several – about a year later from Mr. Conrad, he admitted that Officer Hare tried to recant to him as well, as did Jackson when he was interviewed initially and voluntarily. Said, yes, he recanted to me. And this is the first time that OIG ever learned of the recant, primarily because of, I would submit, some type of miscommunication between Federal Protective Service and OIG. Are you arguing this to a jury? Well, Your Honor, the – because the issue is the sufficiency of the evidence. And what we did is we presented a witness. That was the Regional Director of Joseph Lorazel, who testified to the policies and procedures in effect, basically saying that Mr. Jackson acted appropriately. But, counsel, our standard of review requires us to review the evidence in the light most favorable to the government in determining whether there is sufficient evidence to convict. For purposes of Rule 29, for purposes of Rule 33, Your Honor, I'll move on to the actual facts or the actual argument. What's missing? What's missing, Your Honor? If it's insufficient, what's missing? Well, there is no proof that Mr. – there is no evidence presented, nor do they contradict the defense's theory that Mr. Jackson was following reasonable policies and procedures in Region 9 when he didn't include the recant in his report. And the Regional Director came in and testified. And I think the government, and I think the most egregious conduct occurred, it was prosecutorial misconduct. Well, didn't Atkinson, FBI agent Atkinson, testify that defendant admitted that he was leaving things out in order to protect hair from possible criminal or civil liability? Ms. Atkinson, yes. She testified several years after taking the statement and said that he was deliberately vague, which, in fact, he was by virtue of the policy itself, that he was protecting – there was an interest in protecting the Federal Protective Service officers, which is true according to the policy. But she – her testimony is that he admitted that he knew what he had done was wrong and that he knew that he had done it and that his purpose, according to her testimony, wasn't to follow a policy but was to protect an individual from repercussions. And I know that there was other evidence as well, but why isn't that evidence sufficient to establish his state of mind and his wrongful purpose in filing a misleading report? Because I think, Your Honor, the information as presented by FBI agent Atkinson and the information provided by FBI Atkinson was taking – certainly taken before she admittedly was aware of the policies and procedures. In fact, the government wasn't aware of these policies and procedures because they never asked until, of course, we presented it during the course of our pretrial and at the time of the trial. She took these statements and certainly put them, I believe, Your Honor, out of context. And certainly, what Mr. Jackson – Mr. Jackson admittedly didn't testify. Sotomayor, isn't that a question for the jury as to what your client meant when he made these confessions to her? Well, Your Honor, I think that they were also entitled to hear what the regional director, Laura Zell, had to say about the policies and the propriety of Mr. Jackson's actions. And they were seriously undermined by what I would submit as prosecutorial misconduct in the points that I outlined. Number one, in the rebuttal closing – and I think perhaps most egregiously in the rebuttal closing, the government prosecutor stated that if this is true, if this policy is to be believed, then wouldn't you expect that the defense would have called other criminal investigators in to corroborate? Well, they knew full well, number one, that other criminal investigators would corroborate this. Where would we find that in the record? In connection with the – That they knew full well. Based on the witness who submitted an affidavit in connection with the motion for a new trial, the government's witness, David Scoltetti, was a criminal investigator. He informed the defense that right before the closing arguments, or several days before closing arguments, that the government specifically asked him, saw us speaking to this particular witness, asked him what we talked about. He said they talked about the policies and procedures, and could I verify. And, in fact, he said yes, he could verify that. And he passed that information along to Prosecutor David Vaughn, who was one of the prosecutors. Prosecutor – another prosecutor who gave the rebuttal closing stood up and said that essentially, in effect, that there were no criminal investigators who could corroborate our testimony, knowing full well that it was incorrect. We submitted those affidavits. They were unchallenged by the government during the Rule 29 and 33 motions. And that's how they make their way into the record. Also, Your Honor – Let me understand. The prosecutorial misconduct was raised before the district court when? It was objected to immediately during rebuttal, and it was raised in the motion for new trial and the Rule 29 and 33 motions. And ultimately, we submitted a brief which had the same affidavits that are attached to the appendix by four criminal investigators. And mind you, there's only a handful of criminal investigators. So essentially, every criminal investigator corroborated this policy, but most egregiously, David Scoltetti communicated this policy to the government before they ever closed their case. I want to understand your position as it sort of plays out in real life. So an investigator like your client who finds out that someone else has lied and has given false evidence against a third party, what are they supposed to do under your supervision? Do they lie about it in a written report? They do what? That's a great question. They are supposed to report it to their supervisor, Michael Conrad, which he did. By the government's own admission, Conrad knew of the recant. And then he also was – Director Lorazel testified that he instructed in Mr. Jackson's presence that he instructed Michael Conrad, the superior, to report it to OIG. And then, Your Honor, he submitted affidavits in the course of the – and this, admittedly, was not before the trial court. Mr. Conrad did, in fact, state that he reported it to OIG agent Shovar, Lisa Shovar, who also was a government witness. But I don't understand how that policy gives someone license to file a report that is false. In other words, perhaps you would file no statement at all about your interview because you're caught between a rock and a hard place. But I don't understand how it gives you license to file a false or misleading report about that interview. Your Honor, his interpretation, and certainly Joseph Lorazel's interpretation, who, by his own admission, was probably further to the right or to the left, depending upon where you – what your view is in terms of these policies. I don't believe that the report itself was false for – under the circumstances in which it was prepared. And that was regarding the Petrie investigation. Petrie was on the 20th, when the report was finalized and signed off on, also signed off by Supervisor Conrad, Michael Conrad. When that occurred, Petrie was released. The discrepancies were readily apparent. And the witnesses who testified – that's in the brief, but the witnesses who testified said that it was in – the videotapes themselves – were so clearly conclusive that any prosecution against Toyinher could have commenced based on what was in that report. But that's not the standard, is it, for whether someone's allowed to file a false or misleading report if somebody else can figure it out? Well, no, that isn't the standard, Your Honor. But I guess where I differ is I don't believe, and I don't think Director Lorazel, when he testified, and certainly the evidence that we presented during the course of our trial, I don't believe that this statement was false. I don't believe that the report of investigation was false. It served its intended purpose, and that is to clear or to convict, to lead to the conviction or to lead to the acquittal of a Petrie, of this Jeffrey Petrie. And, in fact, it did. The actual – the actual internal investigation that was to commence should have commenced after. And at that point, and as Director Lorazel testified to, when the Well, wait a second. And how do you ever know about the recant? Well, number one, you know about the recant because the investigator is going to testify to it. He becomes your witness. Charles Jackson would have become an OIG witness, and he did the moment he was interviewed by OIG. And OIG admitted in the course of the trial, and again, it's in the brief, we didn't know anything about the recant when we spoke to Conrad and Jackson. Conrad and Jackson volunteered the information. Oh, by the way, there was a recant. So the process worked. And had OIG been informed, through no fault of Mr. Jackson, but had OIG been informed in a timely fashion, the process would have worked a lot sooner. So there is a – you know, and – What is the – I guess I'm not – I'm not following. This is a fairly serious thing. There was a – the – these people are supposed to be guarding the 450 Golden Gate. That's correct. And they apparently went off after somebody who they saw ran a red light, and they admitted this to the person who – that they had lied when they said that they saw him as he was going in front of the courthouse, behind the courthouse. Right. After several days when they were finally confronted with the videotape that my client had – Your client is the one who was supposed to investigate it. That's correct. And your client didn't put in – in his report that there was an admission that they were – that they were off-site pursuing something that they shouldn't have been pursuing. Correct. Why isn't that a fairly serious matter? What is the injustice here? What happened to your – in a nutshell? Well, because – because he did put in his report that, in fact, there was – that these witnesses could not have done what – or could not have – not the witnesses, but the officers could not have done what they stated. Now, essentially, he put forth the discrepancies. What the injustice occurs is that he was following reasonable, at least what he believed to be and what Regional Director Lorazel, the chief of the whole region, San – California, Nevada, and other states, what he articulated as the policies and procedures. But, counsel, isn't that really the importance of – of Atkinson's testimony? Because according to her testimony, your client admitted that the reason he did it was to protect his fellow person from any repercussions for having lied, and – and he did not tell her – did not tell her that he was doing it because of an – an understanding of what policies and procedures he was supposed to follow, and he admitted to her that he knew it was wrong. So why isn't – in terms of the factual record in front of us, what is even the remaining relevance of this argument that he was following policy when there was evidence that that wasn't his rationale and the jury was entitled to believe that? Because I – Your Honor, I – with all due respect, I don't think that that – I think, again, his statements were taken out of context, and we were – we were left to, unfortunately, rely on the recollection of FBI Gene Atkinson. And then you're asking us – you're asking us to put ourselves in the position of the jury, aren't you? Yes, but – but I – I understand that. But what I'm – what I'm suggesting, though, is that the jury, which was presented with evidence that I think would – would certainly lend support for what Mr. Jackson stated in his so-called confession to FBI Gene Atkinson, if you take the testimony of Lorazel, Regional Director Lorazel, and what I'm arguing is that – and I'm not asking this panel to act as jurors, but what I'm arguing is that, essentially, the conduct, the misconduct of the government, the one that we talked about and the others that I briefed, essentially the most – the second most or another egregious conduct was when they tried to impeach Regional Director Lorazel by asking if he was subject of an investigation, the first question. I would like to know what prejudice flowed from that, because the only – he answered no before the colloquy was had with counsel, and counsel was admonished to move on, and the jury was told that something irrelevant had been brought up. So if the jury was paying attention, they would have either concluded that no, he wasn't the subject of an investigation because there was no contrary testimony to his denial, or that they should just ignore it because the judge told them to. So where is the prejudice from that? Well, he was the sole defense witness whose credibility was essential. And the very first words, first question out of the prosecutor's line of questioning was, are you currently under investigation by – aren't you currently under investigation by OIG? And he said no. Right. But thereby suggesting that – Thereby suggesting what? If the jury heard no, I'm not, they must have thought, well, this guy's barking up the wrong tree. Why would they draw anything bad from that? You know, that – I actually disagree with that. That's what the jury would conclude. In fact, the district court, Judge Patel, disagreed with that. She said that the obvious intent was to taint a jury and to paint a picture of a man, meaning Joseph Lorazel, that he was under investigation. She said period. The reason why I believe at this point she didn't grant her motion for a new trial was because we were still at the start of her case, and she felt that a curative instruction could resolve that. But certainly, there was no attempt to go back into the facts of what – and we argued, we laid out that we felt that there was no good faith basis to ask that question, that, in fact, there was no investigation. And that's essentially what the district court found. But I don't believe that a curative instruction telling the jury to move on and disregard that could have done that, could have cured any defect. It's not going to correct it. Well, it might not if he hadn't answered the question. But since he answered it, no, and that was never contradicted, then wouldn't it just make it look like the prosecutor had done something silly or irrelevant? Or something that the jury should not have heard. And I just don't think that, realistically speaking, if we can take it in terms of how, I think, Your Honor asked the question, and how this plays out in the real world, well, how this plays out in the real world, I don't believe it was – we can assume that the jury could disregard the taint of that question, certainly the intent of that question, by the curative instruction. I understand Judge Patel did the best she could. She wasn't prepared to order a mistrial at that stage of the proceedings. But I do believe that she, Judge Patel herself, thought this was egregious conduct. I quoted the passage. Counsel, you've just about used all your time. If you want to save a minute for rebuttal. Thank you, Your Honor. Please, the Court. Nathaniel Pollack, on behalf of the United States. Mr. Pollack, you're currently under investigation, are you, by the ethics group? No, I'm not. And how do you like that for a first question? I understand the – Does the answer no mean that everyone back there thinks it's no, because I'm smiling? It may not. The other Mr. Duffy asked that as the first question, without doing anything else, isn't it? Aren't you currently under investigation by the Inspector General? Correct. And the government readily concedes that Mr. Duffy should have brought that up with the judge before asking that question. However, How did he think he was going to do it? Whose investigation? An investigation started by the U.S. Attorney's Office? Is the question how does he think that would have been? First of all, he says there was an investigation started by the U.S. Attorney's Office, instigated by the U.S. Attorney's Office. If he is permitted to do that, aren't we then, in effect, giving a whitewash to every criminal case where the U.S. Attorney can turn around and say, Mr. Witness, for the defense, you're currently under investigation by the grand jury. Isn't that true? Well, he wasn't permitted to do that. He was – he was – the question was – He was – he answered no, because he didn't know. All right? And Duffy insists that he was. He didn't insist that to the jury. I understand that, but – The question and the answer. Even Duffy indicated that it was because the guy didn't know. I don't know if that's in the record. I do think that the colloquy after the – after the – the – outside the presence of the jury, Prosecutor Duffy argued that it was relevant to show bias against – Bias? Is that – are we permitted to do that, set up a bias? Does the prosecutor have the right to start a grand jury investigation for every witness who potentially is going to come and then ask the question, isn't it true that you're under investigation by the grand jury? If the answer to that is no, then this man's question was improper. The – the question may well have been improper. There's – there's no evidence in the record that the prosecutor – And it was the first question that was asked, right? And it was ruled inadmissible, and a limiting instruction was given. And this Court has – has held in many cases that we – we must presume that juries follow limiting instructions when – when they are given. In addition, the answer to the question against the prejudice – But there was more than this, wasn't there? Wasn't there more than this by Mr. Duffy? In the final – in the rebuttal summation, didn't he switch or attempt to switch around who's got the burden of proof? I don't think he did. I think under – under this Court's cases, for example, I don't think he did. He knew that there were other potential witnesses, didn't he, in two ways? Counsel only mentioned one. He – he may have known that, you know, first of all, I don't think he did know that there were other potential witnesses because he didn't know that the policy existed. He knew that Director Lorazel asserted that he had – he had had this policy, and he also knew that Director Lorazel asserted that he promulgated the policy in a, quote, all-hands-on-deck meeting. But this – this was disclosed prior to that time. This was disclosed in Lorazel's testimony. However, he – he – You mean to say there was nobody at the U.S. Attorney's Office that ever bothered to ask any of these people before? They knew that Lorazel was coming, didn't they? I don't think that that's in the record. The – the – what's in the record is that Lorazel testified to the existence of this policy, and on – on rebuttal closing, the prosecutor pointed out not that no other witness could have been called, but that, in fact, there had been no witness to corroborate. Now, under this Court's decision in United States v. Cabrera, for example, the Court says a prosecutor's comment on defendant's failure to call a witness does not shift the burden of proof and is, therefore, permissible. Now, there's no suggestion in the rebuttal closing that Jackson should have testified. That would be impermissible, suggesting that the defendant himself should have testified. But that's not at all suggested. It's – it's evident that that's not suggested, because that's not. But is – is the government permitted to say, oh, he's got the burden of proof on that? No. I don't think that that suggests that he has the burden of proof. It just suggests that the – Even the burden of coming forward. It – Aren't most juries charged, the defendant is not required to do anything? He has – Absolutely. Okay. So then how come the government can stand up and say, oh, he should have called witnesses? The defendant didn't say he should have called witnesses. He just pointed out that, in fact, that policy was uncorroborated. And – and that has been held under this – this Court's cases to be – to be proper. Again, another case, the United States v. Nikochia, 968 F. 2nd, 1273, a prosecutor is entitled to comment on the defendant's failure to present witnesses so long as he doesn't call attention to the defendant's own failure to testify. Another case I'll cite, United States v. Hill, 953 F. 2nd, 452. I mean, this is – and furthermore, I'm – But that's – those cases, are they not isolated incidents within a long record? This is not an isolated incident. I would also – We have at least two incidents here where something you say, well, it may have been improper, but it's not improper, because the guy answered no and the jury, you know, didn't pay any attention to it. But how do you play – The jury instructed not to pay attention to it by the court. But you play fast and loose and, you know, it adds up to prosecutorial misconduct, doesn't it? I don't think so. I think – Was there any such incidents like that in the cases you're citing us? Well, in the cases that I'm citing, they were similar in that the – the – The one comment was made in both cases. The closing argument was made, and it was ruled to be not improper, therefore not – not improper prosecutorial misconduct at all, that you can – you can comment on the fact that corroborating witnesses had not been presented. Now, you can't say that the defendant should have testified, and that's clearly not done in this case. I would also point out to the Court that this is on plain error, that the appellant stated wrongly in his opening argument that he objected to the rebuttal closing remarks. I think if this Court looks at the appellant's appendix, pages 213 and 214, they will find that, in fact, he did not object to those remarks. And so we're on – on plain error here. Appellant's appendix? Appellant's appendix 213 and 214. He objected previous to those remarks, but as to the – to the remarks themselves, there was no objection. I think that Judge Graber has identified correctly the most relevant facts in this case, that is, that the defendant himself admitted that he not only intentionally omitted the recant, but that he did so in order to create a deliberately vague report, and he created a deliberately vague report in order to protect Officer Herr from possible disciplinary, criminal, or administrative investigation, and that, further, he had a dislike for internal investigations generally, didn't want to burn a fellow officer, and, finally, that he knew all of that was wrong. Now, that does not suggest of someone who was acting pursuant to a local policy. There was no – there's no mention of a local policy in that – in that testimony. Whether it's out of context or not, it certainly provides sufficient evidence for the jury to find all three of the elements of the crime here. First, he falsified. He created, by his own admission, a deliberately vague report that created a false impression, intentionally a false impression, so that his friend would be protected. Second, that was done knowingly. The falsification was done knowingly. There's no assertion by the appellant that this was – the omission was somehow a mistake or an accident. It was clearly intentional by his own admission. And finally, that it was intended to impede a Federal matter. Again, by his own admission, he intended to impede any investigation of care. And in addition to his own admission to Agent Atkinson, there's also the testimony about his training and what he would have understood that that would – that would be a report that was, in essence, false because it created a false impression. I'd also just like to touch on the issue that the appellant raises with respect to the jury instruction unknowingly. The – that was the inclusion of the Ninth Circuit pattern jury instruction statement that the government's not required to show that the defendant knew his conduct was illegal. Cited on – on pages 23 and 24 of the government's brief are a number – number of cases from the circuit holding just that. And further, that – that core principle is not changed in any way by Arthur Anderson, which construed a different statute, 1512, which the court determined to require that the defendant knowingly, corruptly persuaded, putting together the definition of knowingly, awareness, understanding, and consciousness, and corruptly, wrongful, immoral, depraved, or evil. In that case, the Supreme Court concluded that the mens rea was conscious of wrongdoing. Now, consciousness of wrongdoing, that's not consciousness of illegality. But in any event, the word corruptly is not a part of the statute here. We've already touched on the prosecutorial misconduct issues. In those issues, by the way, let me see if I get this right. You are willing to say that the question asked, the first question asked, was improper. I think that the government is willing to concede, not that it's improper, but that it certainly should have been brought up with the jury – with the judge before it was asked. The jury should have been able to do that. May I – may I ask why? Why was it – why should it have been brought up with the jury, with the judge first? The judge first. Well, to – for the judge to be able to determine whether it was more probative than – whether it was more prejudicial than probative, which the judge obviously did determine. That was the tenor of her language ruling that it was, in fact, not a proper question, was that it was more prejudicial than probative. And that determination was used. Was there any doubt in anyone's mind that it was more prejudicial than probative? What was it going to prove? You say bias. Well, I – I – that's an awful long reach as far as I'm concerned. I don't – I don't know that it's all that relevant to the issues here. It's not relevant, right. So why was it asked? To prejudice, right? And if it was asked to prejudice, it's improper, right? I don't know if it was asked to prejudice. I think – I think it was asked arguably to – to show that this director, Lorazel, had a hostility towards a specific set of internal – internal affairs investigators, that he was perhaps hostile to internal affairs investigations generally. Did you try this case? I did not. And – and – and so – so – but the – the point is, for purposes of this appeal, I think, is that the government – that the court ruled the question not proper, that the – any prejudice was mitigated by the guy's response, and that in any event, a very specific limiting instruction was given. So I think that there was not prejudice here. Did you talk to the lawyer who did ask that question? I have talked to him on the phone, yes. So did you ask him why he asked it? No comment. I – I – I – I – I – I – I mean, I – You did, in other words. I – I – certainly. I – I mean, I think that it was a bad question. And what was his answer? I'll say it was a bad question. It was a – it was a dumb move. It was – it shouldn't have been done. Absolutely. Point taken. It certainly was not the way to start the question. You got the point. The question is, does the U.S. attorneys have the point? Well, I would hope so. I mean, I think that – that – that certainly – If the case was reversed on the basis of prosecutorial misconduct, they would have had the point, wouldn't they? That's true. I don't think that that would be proper under this Court's legal standards, however. And – and – I may be surprised. Go ahead. In summary, I would like to – to – to point the Court, again, to – to the central evidence in this case and to state that, though the – the – the question should not have been asked under this Court's precedent, especially with a very specific limiting instruction that was given, it does not warrant reversal under a harmless error analysis. If there are no – no questions? No, Mr. Garber, I believe you asked the question, where's the injustice? Well, since the question was asked, I actually did. Oh, I'm sorry. I'm sorry. I'm sorry. I'm sorry. Well, I tried the case, and I can say that the injustice, the statements, the deliberate, and I think egregious statements that we highlighted by the prosecutor, therein lies the injustice. And to simply say that, well, your client may or may not have made some statements to FBI agent Atkinson, which she testified to, I don't think is enough to cure the instruction. Again, we had one witness, the sole defense witness, if believed, in the context of even FBI agents in Atkinson, if believed, would have exonerated our client. And what – again, the question was asked, why was – why did Mr. Duffy ask the question? Well, I would submit because he needed to prejudice this client to destroy his credibility. And by resurrecting, I think a bogus investigation is improper. By – and by highlighting or commenting that certain evidence could not be corroborated. And I want to point out, if I can, that when we made the allegation, and I think very serious allegations about David Scoltetti, the government, both in this brief and in the reply brief to the Rule 29 and 33 motions, never denied what Scoltetti told them. Thank you. The matter just argued is submitted for decision.
judges: Schroeder, Graber, Duffy